**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MAC HUDSON,**<br>**Petitioner,**<br>**v.**<br><br>**JOHN MARSHALL, JR.,**<br>**Respondent.** | **CIVIL ACTION NO. 06-11755-JLT** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PETITION FOR WRIT OF HABEAS CORPUS**

In this petition, the defendant Mac Hudson seeks relief from several constitution errors in the Massachusetts state courts. The ten grounds raised by Hudson in this petition are largely focused on a single theme. Nearly all of the errors relate to the identification of Hudson as the second shooter. Each of the identifications of Hudson was in some way tainted: either by a failure to identify Hudson at a prior opportunity, or by a subsequent recantation of the identification. Where there was no evidence to connect Hudson to these crimes apart from the tainted identifications, the constitutional errors require this Court to grant the writ.

## I. Issues Presented.

1. The trial court violated Hudson's right to due process by permitting the prosecution to read the prior testimony of Kimbrough, the key Commonwealth witness, to the jury.
2. Hudson was denied his right to effective assistance of counsel at trial where trial counsel failed to introduce a recantation affidavit signed by Kimbrough, the key Commonwealth witness.
3. The trial court denied Hudson's due process right to present witnesses by excluding evidence that an individual who looked like Hudson was committing robberies in the same general area at a similar time in a similar manner.

4. The trial court violated Hudson's Sixth Amendment right to present a defense by excluding an alibi witness from testifying.
5. The trial court's decision while empaneling the jury to change the number of jurors to be seated unfairly prejudiced Hudson's use of his peremptory challenges in violation of his due process rights.
6. The trial court violated Hudson's right to due process when it refused to instruct on the possibility that the witnesses had made a good faith, but mistaken, identification of Hudson.
7. The trial court violated Hudson's right to confront the witnesses against him by improperly limiting his cross-examination of Dorma Hughes concerning a conversation she overheard between a prosecutor and Dwayne Moody.
8. The trial court denied Hudson his right to due process when it refused to declare a mistrial after a surprise, first-time, in-court identification of Hudson by Larry Brown.
9. The prosecutor failed to turn over exculpatory evidence to Hudson.
10. The Commonwealth's failure to disclose exculpatory evidence in its possession that could have materially aided Hudson amounts to a *Brady* violation and violated Hudson's due process rights under the United States Constitution.

**II. Course of Proceedings.**

On, August 11, 1989, the Suffolk County Grand Jury indicted Hudson for the first degree murder of Derrick Twitty and other related charges (SA:VI:XX at 19-23).[1] Following a two-

[1] The Respondent's Supplemental Answer is cited in the following format (SA:volume number: tab page); the transcript of the first trial is cited (1st Tr. volume/page); the transcript of the second trial is cited (2nd Tr. volume/page); other transcript volumes are individually described and cited to page.

week jury trial, Judge Murphy presiding, Hudson was convicted of second degree murder and other charges. The Massachusetts Appeals Court ("Appeals Court") reversed the convictions and ordered a new trial. *Commonwealth v. Hudson*, 36 Mass. App. Ct. 1115 (1994).

Hudson was retried before a jury with Judge Volterra presiding. On January 29, 1997, Hudson was again convicted of second degree murder and other charges (SA:V:KK 6). The convictions were affirmed on appeal. *Commonwealth v. Hudson*, 49 Mass. App. Ct. 1118 (2000) (SA:I:E). Hudson timely filed an Application for Further Appellate Review before the Massachusetts Supreme Judicial Court ("SJC") (SA:I:G). The SJC denied his application on September 8, 2000 (SA:I:I 1). Hudson's direct appeal raised grounds one, three, four, five, six, seven, and eight as presented in this petition.

On July 13, 2001, Hudson filed his first motion for new trial (SA:II:J), which was subsequently denied by Judge Volterra (SA:V:KK 6). On appeal the Appeals Court remanded for an evidentiary hearing (SA:V:XX 36-40). Hudson's first motion for new trial was again denied following an evidentiary hearing presided over by Judge Lauriat (SA:II:Q). The Appeals Court initially affirmed the denial without further briefing (SA:II:R). However, on Hudson's petition for rehearing, the Appeals Court reversed the convictions and ordered a new trial. *Commonwealth v. Hudson*, 63 Mass. App. Ct. 1113 (2005) (SA:II:U). Hudson's first motion for new trial raised grounds two and nine as presented in the instant petition.

Following the reversal of his convictions, Hudson's motion for bail was allowed by Judge Ball and on January 10, 2006, and Hudson posted bail (SA:V:KK 8). The SJC granted the Commonwealth's request for further appellate review and reinstated the convictions on May 16, 2006. *Commonwealth v. Hudson*, 446 Mass. 709 (2006) (SA:III:II). Judge Ball reimposed the sentences, but granted Hudson 24 hours to wrap up his affairs (SA:V:KK 8). Hudson complied

with the order and voluntarily surrendered the following day (Id.).

On September 28, 2006, Hudson filed this instant Petition under 28 U.S. C. § 2254 for Writ of Habeas Corpus by a Person in State Custody raising nine grounds. On May 5, 2008, Hudson moved to stay the instant proceedings. On February 3, 2009, the petition was stayed to allow Hudson to litigate a second motion for new trial in state court. On August 5, 2009, the petition was ordered closed without the entry of judgment without prejudice to reopening the petition upon the completion of litigation in state court.

On May 22, 2008, the Suffolk County Superior Court docket Hudson's second motion for new trial which he had been trying to file for some time (SA:V:KK 9). Hudson initially filed his second motion for new trial *pro se*, but counsel, Attorney Julie Ann Boyden, later filed an amended second motion for new trial on Hudson's behalf (SA:V:KK 9-10, MM & LL) This motion was denied on February 3, 2009, and the defendant timely appealed (SA:V:KK 9-10 & OO). The clerk's office delayed assembling the record for Hudson's appeal of the denial of his second motion for new trial.

On July 20, 2010, Hudson, *pro se*, filed his third motion for new trial (SA:V:KK 10; & PP). Hudson's third motion for new trial raised, *inter alia*, the claim that is raised as ground ten in the instant petition. After Hudson filed his third motion for trial *pro se*, undersigned counsel filed an appearance on Hudson's behalf in state court. Judge Ball allowed Hudson's discovery motion filed in connection with the third motion for new trial and granted him access, for the first time, to the prosecution and Boston Police Department files relating to the Twitty murder (SA:V:KK 10-11).

On May 23, 2012, Hudson supplemented his motion for new trial with new information discovered as a result of his access to the files (SA:V:KK 11 & RR). Judge Ball heard

arguments at a non-evidentiary hearing on December 17, 2012 and issued a decision denying the third motion for new trial on December 26, 2012 (SA:V:KK 11 & TT). In denying Hudson's third motion for new trial, Judge Ball wrote that she did not have the resources to properly consider Hudson's claims and indicated that the Appeals Court should review the claims *de novo* (SA:V:TT 3).

On April 4, 2013, Hudson filed a notice of appeal on the denial of his third motion for new trial, which was deemed timely filed by the Appeals Court (SA:V:KK 11).

The clerk's office assembled the record separately for the two appeals. The Appeals Court subsequently consolidated the two appeals and affirmed the denials of the second and third motions for new trial on May 5, 2015. *Commonwealth v. Hudson* 87 Mass. App. Ct. 1118 (2015) (SA:V:ZZ). Hudson timely filed an Application for Leave to Obtain Further Appellate Review with the SJC (SA:V:ZZ2). Hudson's timely request for further review was denied on June 26, 2015 (SA:V:ZZ3).

On July 28, 2015, Hudson filed motions to reopen the petition and to amend the petition to include a new ground that was raised in his third motion for new trial. The motions were allowed and on December 11, 2015, Hudson filed the amended petition which included the nine grounds raised in the original petition plus ground ten that was raised in his third motion for new trial.

**III. Statement of The Facts.**

**A. Twitty and Jones are shot during a robbery.**

On April 22, 1989, in Roxbury Massachusetts, two assailants approached heroin dealers Twitty and Mark Jones. Twitty died from a single gunshot wound to his head. Jones was also shot once, but he survived. The alleged motive for the shooting was robbery. In affirming the

denial of Hudson's first motion for new trial, the SJC summarized the evidence against Hudson:

> At the first trial, Keil Kimbrough was the primary witness against the defendant. He testified that the defendant and Hughes, the [co-defendant], were the shooters. Kimbrough had known both of the defendants for about four years. He testified that, on the day in question, he left his aunt's house at 595 Dudley Street in the afternoon and proceeded to a nearby corner where he witnessed the shooting of Twitty and Jones. At the Roxbury District Court two days later, Kimbrough informed the police that he had witnessed the shooting. Kimbrough was then taken to a police station, interviewed further and shown approximately 300 photographs. He identified those of Hughes and the defendant as the shooters.
>
> There was additional eyewitness testimony from two bystanders, Dwayne Moody and Larry Brown, as well as Jones, the second victim who survived the shooting. Dwayne Moody identified the defendant at trial as the shooter. He testified that the defendant had a distinguishing birthmark on the left side of his face that looked like a "burn mark" or a "mole" and that he had previously selected a photograph of the shooter from a photographic array that showed that facial scar (Moody also selected a photograph of Hughes). Moody was impeached by evidence that he had not been able to identify Hudson at a preliminary hearing one week earlier, but Moody responded that his failure to make an identification at that time occurred because the defendant was wearing glasses that covered the distinctive mark. Larry Brown, another bystander, stated that he was present at the shooting and did not recognize the defendant. He was not asked to identify Hudson. Jones, the surviving victim, testified at trial that he was interviewed in a hospital one hour after the attack when he did not know whether he would live. He described the assailants to Boston police detectives and, two days later, he selected photographs of the defendant and Hughes as the shooters. Jones identified Hughes as one of the assailants although he said he did not see his face at the time of the shooting. As to the defendant, he said he "wasn't sure," but the photograph he had chosen was a person who "looked like" the defendant. He "[could not] say" that the defendant was the second assailant. Of all the eyewitnesses, Kimbrough was the only one who knew the defendant. He was cross-examined extensively as will be detailed below. No forensic evidence connected the defendant to the crime.

*Hudson*, 446 Mass at 721.

**B. Facts relating to the investigation and the identification of the defendant.**

In 1989, the same year the instant case was investigated, the Boston Police Department underwent heavy scrutiny by the Office of the Attorney General and the Office of the United

States Attorney for using improper investigative techniques and improper interrogation tactics consisting of coercion, threatening, and offering inducements to encourage witnesses to lie to implicate Willie Bennet in the Carol Stuart murder. Several of the officers implicated in that investigation were involved in the investigation into the Twitty murder (SA:V:XX 59-62).

The assailants involved in the Twitty murder were described as follows: one shorter person, slim to medium build, wearing a brown leather jacket and knit hat, between 5'3" to 5'6" and one taller person between 5'11" to 6' wearing a goose down coat with a brown/beige collar with dark skin. The shorter person was described as using a long barrel gun. There was a distinct four to five-inch difference between the two assailants. Hudson and Hughes were only approximately 2 inches apart in height (SA:V:XX 88-89).

The initial discovery received from the Commonwealth indicated that several witnesses, including Heriberto Ramos, Michelle Wigfall, Omayara Ramos, and Moody viewed photographs. None of these witnesses identified the assailants. During the suppression hearing, it was revealed that the police had not kept a record of which photographs were viewed by which witnesses (SA:V:XX 89).

Detective McCarthy prepared a photographic array which included the pictures of Hudson and Hughes. McCarthy testified that he received their names from a source that led to the compilation of an array on April 24, 1989. He identified that source as Kimbrough. This statement did not appear in any police report or in any of the other discovery (SA:V:XX 89). At the time of the investigation, during April of 1989, McCarthy arrested Hudson and Louis Andrade for an unrelated incident.

McCarthy and O'Mally presented the array to Jones at Boston City Hospital and Jones made a tentative identification of Hudson, claiming that Hudson looked like the shooter. They

were the only witnesses to Jones's tentative identification of Hudson as the shooter (05/11/90 Supp. 25; 1st Tr. 8/7-8). Prior to the grand jury, Jones signed an affidavit recanting his identification and claiming that he had been pressured to identify Hudson (SA:V:XX 188-190). Jones did not identify Hudson at the first trial (1st Tr. 7/116-117). At the second trial, Jones identified Hudson during direct examination as looking like the shooter and affirmed his recantation affidavit during cross examination (2nd Tr. 6/122). Jones did not identify Hudson as being the shooter, merely that he looked like the shooter.

Shortly before the grand jury heard this case, the police received a report from Julietta Gallop that she and her brother could identify Terry Carter[2] as the shooter of Twitty. The initial report did not implicate Hudson. After speaking with the police, Gallop identified Hudson as the shooter. At the suppression hearing, O'Mally explained that he was not troubled that the initial report did not mention Hudson and that after his interview with Gallop he solidified his theory that there were three assailants involved with the shooting (05/11/90 Supp. 63-64) (SA:V:XX 90-91).

Gallop later claimed that Hudson had threatened her in writing. Review by a handwriting expert was inconclusive and the only print recovered from the threatening letters did not match Hudson (SA:V:XX 91-92). Gallop testified before the grand jury and identified Hudson (see Grand Jury testimony). Gallop was not called as a witness at trial. Gallop provided an affidavit in connection with Hudson's second motion for new trial indicating that she had falsely implicated Hudson at the behest of O'Mally in order secure early release from a sentence she was serving (SA:V:XX 55-56).

Ten days prior to trial, the Commonwealth produced Kimbrough, AKA Keial Tillery,

---

[2] Carter was charged along with Hudson and Hughes. Carter was acquitted.

AKA Courtney Woods, as an eyewitness to the shooting. Kimbrough positively identified Hudson and Hughes (SA:V:XX 92). Hudson moved to suppress the statements of Kimbrough as the Commonwealth had not complied with its discovery obligations and Kimbrough was a surprise witness. The first trial judge denied the motion but indicated that Hudson would be given latitude on cross examination (1st Tr. 6/21).

Hudson also moved to suppress other identifications. At the suppression hearing, McCarthy testified that he received a call from the prosecutor asking if the photo array had been shown to any other witnesses. He claimed that Kimbrough had viewed mug shots on April 24, 1989, and had positively identified Hudson and Hughes (SA:V:XX 92-93). Kimbrough testified that he saw on officer he recognized at the Roxbury District Court, told him that he was a witness to a recent shooting, and was then escorted to the Area B-2 police station to meet with McCarthy. Neither Kimbrough nor McCarthy could remember the name of this officer (2nd Tr. 4/87, 116-167). McCarthy did not keep a record of the mug shots viewed by Kimbrough. McCarthy testified that based on Kimbrough's identification, he prepared the photographic array later presented to Jones and Ramos. He claimed he had not revealed this previously as Kimbrough did not want to be involved (2nd Tr. 7/167). Kimbrough denied making any request to remain anonymous (2nd Tr. 4/163).

Kimbrough has repeatedly denied making an identification (SA:V:XX 184-185). He has also denied being present at the shooting and has indicated that he was given the facts of the case by McCarthy (Id.). Kimbrough's statements became more consistent with the Commonwealth's theory as the trial approached. For instance, he initially calls the defendant Hutchings but eventually calls him Mac Hudson at trial (2nd Tr. 4/138-139, 149-150; 7/185-186).

Moody was initially shown photographs, but did not identify anyone (SA:V:XX 96).

Approximately two weeks after Twitty's murder, Moody was picked up on Brook Avenue by Detective Holland and transported for an interview by O'Mally and Fogerty. Again Moody failed to identify anyone and again no report was generated. Moody testified to the Grand Jury that he did not know the shorter assailant (see Grand Jury minutes) (SA:V:XX 95-96). At the suppression hearing, Moody failed to identify Hudson. Following the hearing, Dorma Hughes heard the prosecutor asking Moody if he recognized Hudson, identified as the third man at counsel table, as the shooter (2nd Tr. 7/84-85).

Most likely because Moody had not previously been able to identify Hudson, the Commonwealth did not ask Moody to identify the defendant during the first trial. However, during cross examination at the second trial, Moody identified Hudson and indicated that he had failed to recognize him previously because Hudson's glasses had concealed a scar (2nd Tr. 4/198; 5/229). Moody claimed he had told the detectives about the scar, but the detectives did not confirm this (2nd Tr. 5/207-208, 230).

The only other witness to identify Hudson at the second trial, Brown, identified Hudson without having been asked to and added that he had also identified Hudson at the first trial. This surprised everyone. The Commonwealth stipulated that it was not true as Brown had neither been asked to nor had identified Hudson at the first trial.

Long after trial, Hudson was able to review the parole board's file on him and he discovered, for the first time, a report concerning Andrade made shortly after the shooting in which Andrade claimed to have knowledge of the crime and which claimed that Hudson had confessed to him (SA:V:XX 169-173, 179-180). Andrade did not appear before the grand jury and was not called as a witness at trial. The Commonwealth has not contested that this report had not previously been turned over to Hudson.

As a result of a discovery motion filed in connection with his third motion for new trial, Hudson was granted access, also for the first time, to the Commonwealth's and the Boston Police Department's files relating to the Twitty murder (SA:V:XX 207). In the files were several additional items that had not previously been disclosed to Hudson. These previously undisclosed materials include documents indicating that Kimbrough's sister was seeking employment from the District Attorney's Office around the time Kimbrough may have been becoming a witness for the Commonwealth, but before the prosecutor acknowledged being aware of him (SA:V:XX 195, 198-200, 207). Also in the files were several previously undisclosed notes and written statements identifying suspects other than Hudson to Twitty's murder and contradicting the time-line of the investigation presented by the police at trial (SA:V:XX 195, 201-207).[3]

**C. The "Jewett" Defense Motion Record**

At the first trial, a *voir dire* hearing was held on Hudson's proffered "Jewett" defense. The transcript of this hearing was provided to the second trial judge in support of Hudson's motion *in limine* to admit his "Jewett" defense evidence.

Bradford Jones testified that he was a Boston police detective assigned to Area B-2 in Roxbury (1st Tr. 10/113-114). He investigated the robbery of a Freddy Ellis that occurred on August 7, 1989 (1st Tr. 10/114). On August 28, 1989, Ellis looked at photographs at the B-2 station and identified Hudson as one of the persons that robbed him (1st Tr. 10/114-115). A complaint was issued against Hudson (1st Tr. 10/115).

The robbery of Ellis occurred on Homestead Street in Roxbury and there were three

---

[3] These materials are discussed in greater detail in the Argument for Ground Ten, below.

assailants (1st Tr. 10/115-116). It occurred at about 1:55 AM (1st Tr. 10/118). This location is less than one mile from the intersection of Dudley and West Cottage Streets where Twitty was killed (1st Tr. 10/118-119). Ellis was robbed of a chain and money (1st Tr. 10/122). He described one of the men as 5'5" (1st Tr. 10/123). He described one of the other assailants as 6'2" and dark skinned (1st Tr. 10/123). He described the third assailant as 6' (1st Tr. 10/124).

The Commonwealth stipulated that Hudson was in custody on August 7, 1989 (1st Tr. 10/127).

Ellis testified that he was the victim of a robbery on August 7, 1989 (1st Tr. 10/130). He said there were three assailants; one was about 5'7", one about 5'9", and one about 6'1" (1st Tr. 10/130).

On August 29, 1989, Ellis looked at photographs at the B-2 station and selected one (1st Tr. 10/130-131). He identified Hudson as the person whose picture he picked out, but said it was not Hudson that robbed him (1st Tr. 10/131). He said that Hudson did not look like the person who robbed him (1st Tr. 10/132). He said that the assailant who approached him told him to "kick in" his jewelry (1st Tr. 10/134). The assailants chased him when he ran away (1st Tr. 10/134).

At trial, Hudson was alleged to have stated to Twitty, "I told you to kick it in" (2nd Tr. 7/18-19).

**D. Additional facts regarding the claims of ineffective assistance of counsel raised in Hudson's first motion for new trial.**

In his second trial, Hudson had an alibi witness who would place him elsewhere at the time of the shooting (2nd Tr. 8/128, 131), but because trial counsel failed to notify the Commonwealth that the witness would give alibi evidence (2nd Tr. 8/129-130), the trial court

excluded her testimony citing the Massachusetts Rules of Criminal Procedure (2nd Tr. 8/130-131).

Trial counsel, who was also appellate counsel on direct appeal, argued, among other things, that the trial court's decision to exclude testimony from Hudson's alibi witness violated due process of law (SA:II:N 46-51). The Appeals Court rejected that argument, making it plain that, in the court's opinion, trial counsel caused Hudson to lose the benefit of his alibi witness. *Hudson*, 49 Mass. App. Ct. at 1118 (SA:I:E 1-2). The Appeals Court made it clear that the loss of an alibi defense was due to counsel's failure to timely notify the Commonwealth about the alibi witness (*Id.*). To his credit, defense counsel admitted that he had the alibi defense under consideration even before the trial (SA:III:GG 387) and that he should have notified the Commonwealth about the possible alibi when there was a reasonable probability that it would be used instead of when the decision to proceed with the alibi defense became firm (SA:II:N 113). Defense counsel had met with the potential alibi witness prior to trial and was impressed with her (SA:III:GG 409).

Prior to the second trial. Kimbrough had signed an affidavit recanting his testimony from the first trial (SA:II:N 97, 107). In addition to the recantation affidavit, counsel had affidavits from Harold Smitherman (SA:II:N 98) and Michael Holloway (SA:II:N 96) which supported Kimbrough's recantation (SA:III:GG 372-375). Counsel had reason to believe that Smitherman would testify that he had a baby with Kimbrough's sister, that in early 1992, Kimbrough had admitted to Smitherman that he had testified falsely about being present with Twitty was shot. Kimbrough also told Smitherman that McCarthy had coerced Kimbrough to adopt the facts of the shooting, that police showed him photographs of Hughes and Hudson, and that the police promised Kimbrough consideration with his pending cases (SA:II:N 98). Similarly, counsel had

reason to believe that Holloway would testify that Kimbrough told him he had lied during the first trial and that Holloway witnessed Kimbrough sign the recantation affidavit (SA:II:N 96)

Finally, defense counsel had an investigator's report regarding and a signed affidavit from Kenneth Bodden (SA:II:N 99, 112-113). Per these documents, he and his sister, Nancy Bennet, a.k.a. Julietta Gallop, were together the entire day of the Twitty shooting. The two were briefly near West Cottage Street and Dudley street at around 3:30 PM. They left for a few minutes and returned to find the area restricted by police and learned that Twitty had been shot in their absence (Id.). Gallop was not present when the shooting took place.

Defense counsel had this information, but neglected to use it at trial to contradict the Commonwealth's theory that Gallop was present during the shooting. Kimbrough, Brown and Moody all testified that Gallop was present when Twitty was shot (2nd Tr. V/21-22; 2nd Tr. VII/6-7). That they shared this detail in their testimony may have boosted their credibility in the minds of the jurors.

At the hearing on Hudson's first motion for new trial, defense counsel testified that he was aware Kimbrough had recanted the testimony he gave at his first trial and had signed an affidavit to that effect (SA:III:GG 377). When Kimbrough asserted a Fifth Amendment privilege at the second trial, defense counsel was fixated on the judge allowing in Kimbrough's prior testimony given the affidavit saying that the prior testimony was a lie (SA:III:GG 382-383). Defense counsel was candid that he could not remember whether there was a reason for not using the recantation affidavit at the second trail (SA:III:GG 436-437, 454, 460). However, defense counsel was clear that had Kimbrough testified, counsel would have cross-examined him on the recantation affidavit regardless of the circumstances under which the affidavit was obtained (SA:III:GG 437-438). It would have been inconceivable to defense counsel to not use

the recantation affidavit to impeach Kimbrough (SA:III:GG 455, 459-460).

**IV. Standard of Review.**

Where the state court has reviewed a claim on the merits, this court can grant relief when the state court review, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 404 (2000). Moreover, granting the writ is appropriate where the state court decision was based on an "unreasonable determination of the facts." *Id.*

As to claims not adjudicated on the merits, this court must apply the pre-AEDPA standard of review which accords no deference to the state court's resolution of a federal constitutional issue. *See Medellin v. Dretke*, 544 U.S. 660, 125 S.Ct 2088, 2099-2100 (2005) (Ginsburg, J. concurring). The pre-AEDPA standard of review is *de novo*. *Lavallee v. Coplan*, 374 F.3d 41, 44 (1st Cir. 2004) (claims not adjudicated on the merits in the state court proceedings are reviewed *de novo*); *see also, Williams*, 529 U.S. at 400 (opinion of O'Connor, J.) (pure questions of law and mixed questions of law and fact were reviewed *de novo*), *citing Miller v. Fenton*, 474 U.S. 104, 112 (1985).

**V. Argument.**

**Ground One: The trial court violated Hudson's right to due process by permitting the prosecution to read the prior testimony of Kimbrough, the key Commonwealth witness, to the jury.**

The state court found that Kimbrough had become unavailable at the second trial as a result of his exercise of his Fifth Amendment privilege against self-incrimination and that his testimony bore the required indicia of reliability. *Hudson*, 49 Mass. App. Ct. at 1118 (SA:I:E:2). These rulings are not entitled to deference as they are contrary to or an unreasonable application

of clearly established Federal law. *Williams*, 529 U.S. at 404.

The confrontation clause of the Sixth Amendment made applicable to the states through the Fourteenth Amendment guarantees a defendant the right to confront the witnesses against him. *See Pointer v. Texas*, 380 U.S. 400, 4003 (1965). Hearsay evidence from an unavailable declarant may, however, be offered if it "bears adequate indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). The federal constitutional test has two general categories. In the first category, reliability can be inferred when the proffered evidence falls within a firmly rooted hearsay exception. In the second category, there must be a showing of particularized guarantees of trustworthiness. *See Idaho v. Wright*, 497 U.S. 805, 815 (1990).

Prior recorded testimony typically falls within a firmly rooted hearsay exception. In the case at bar, cross-examination at the prior proceeding was not unduly restricted nor was defense counsel ineffective at the first trial. However, Hudson asserts that this cannot be the end of the inquiry because the central mission of the right to confrontation was serious undermined in the circumstances of this case. Here, the witness whose testimony was at issue had signed an affidavit admitting that his prior testimony was false.

The trial judge believed that Kimbrough had signed such an affidavit and that belief was an integral part of the trial judge's decision that Kimbrough could assert a right to remain silent. In such circumstances, the prior recorded testimony should not be deemed reliable when given simply because there was an opportunity to cross-examine. Kimbrough's affidavit raised the real possibility that his prior testimony was poison: that poison did not belong in the second trial. *See and compare Mesarosh v. United States*, 352 U.S. 1, 14 (1956). Herein, the jury was denied an adequate opportunity for evaluating the truth of the prior statement. Whatever the rubric applied, dissimiliar motives to cross-examine, inadequate opportunity to cross-examine, or no

indicia of reliability, the fact of a sworn recantation cannot simply be ignored when determining whether the prior recorded testimony was admissible.

The trial court violated Hudson's due process rights by admitting Kimbrough's prior recorded testimony. The decisions of the Supreme Court make it clear that the mission of the confrontation clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *Dutton v. Evans*, 400 U.S. 74, 89 (1970), *quoting California v. Green*, 399 U.S. 149, 161 (1970). Where the jury was not informed that Kimbrough had signed an affidavit recanting his prior testimony, the state court decision was an unreasonable application of federal law. Without hearing about the recantation, the jury simply did not have a satisfactory basis for evaluating the truth of Kimbrough's prior statement.

The judge was also wrong when it allowed Kimbrough to assert his Fifth Amendment privilege, thereby making him unavailable as a witness at the second trial. The judge erroneously permitted Kimbrough to plead the fifth amendment and thus prevented Hudson from confronting him with his recantation affidavit. The judge confined the question of whether Kimbrough should testify to whether he would be at risk for perjury or contempt charges. This was error. Although the judge heard oral arguments, the judge failed to conduct a *voir dire* to determine if Kimbrough had voluntarily recanted. Failure to conduct an in-depth analysis resulted in reversible error as the admission into evidence of Kimbrough's prior recorded testimony violated Hudson's Sixth Amendment right to confront and cross-examine the witnesses against him. *See Commonwealth v. Figueroa*, 451 Mass. 566, 576 (2008).

In asserting his Fifth Amendment right, Kimbrough stated that he did not think he could be charged with any crimes (2nd Tr. 4/41). Additionally, the Commonwealth stated that it did not

believe Kimbrough had a valid Fifth Amendment right (2nd Tr. 4/44). Nonetheless, the trial judge ruled:

> May the record reflect that counsel for the Defendant Hughes provided [Kimbrough's counsel] with an affidavit of Keil Kimbrough, where Mr. Kimbrough recanted evidence that he had given at the first trial. The Court also was informed in an unrecorded lobby conference, with all counsel being present, that Mr. Kimbrough had been interviewed by both the Commonwealth and an investigator retained by Mr. Hrones on behalf of Mr. Hughes. Further, an office associate, an attorney associated with Mr. Hrones, also visited Mr. Kimbrough. The affidavit and the interviews conducted by Mr. Hrones developed a theory that Mr. Kimbrough had testified falsely at his first trial. The Commonwealth's interview of Mr. Kimbrough was to the effect that the affidavit had been obtained by duress, when fellow prisoners visited Mr. Kimbrough in his cell.
>
> The Court, after learning all of the facts, and after having been informed of Mr. Kimbrough's position in respect to claiming his Fifth Amendment rights, read *Commonwealth vs. Borans*, 388 Mass. 453 beginning at page 455 through 458. And I conclude that there is some risk that Mr. Kimbrough could be proceeded against for perjury. Moreover, a reading of *Borans* would indicate that Mr. Kimbrough did not, through a waiver by testimony, place himself in a position where he could be compelled to testify, at the risk of contempt.
>
> So, under such circumstances, I rule that Mr. Kimbrough is appropriately asserting his privilege. And, under such circumstances, I also rule that Mr. Kimbrough is now unavailable to the Commonwealth, and that the Commonwealth is free, pursuant to case law, to present to the jury prior recorded testimony of Mr. Kimbrough at the first hearing, where he was subjected to cross-examination.

(2nd Tr. 4/44-46). This decision was wrong for at least two reasons.

Without determining whether Kimbrough's affidavit was signed voluntarily, there was no possibility to cross-examine the integrity of his prior trial testimony. *Figueroa*, 451 Mass. at 576; *Crawford v. Washington*, 541 U.S. 36 (2004). It was necessary for the judge to make a factual determination of the voluntariness of the recantation. Had Kimbrough testified at the second trial, there is no question that the recantation would have been admissible. *Crawford*, 541 U.S. at 59 & n9. However, as cross-examination from the first trial did not include the

recantation, this testimony should not have been admitted. Trial counsel made it clear that had Kimbrough testified at the second trial, he would have presented the recantation. *Hudson*, 446 Mass. at 720.

In order to validly invoke his Fifth Amendment privileges, a witness must face a real risk of incrimination. *Commonwealth v. Dagenais*, 437 Mass. 832, 839 (2002); *Commonwealth v. Martin*, 423 Mass. 496, 500 (1996). In addition, "a witness may not claim the privilege out of fear that he will be prosecuted for perjury for what he is about to say, although he may claim the privilege if his new testimony might suggest that he had perjured himself in testifying on the same subject at a prior proceeding." *United States v. Partin*, 552 F.2d 621, 632 (5th Cir.), *cert. denied*, 434 U.S. 903 (1977); *United States v. Fortin*, 685 F.2d 1297, 1298 (11th Cir. 1982); *United States v. Housand*, 550 F.2d 818, 823 (2d Cir.), cert. denied, 431 U.S. 970 (1977). The second trial occurred eight years after the first trial and thus Kimbrough faced no possible liability for perjury at the first trial. G.L. c. 277, § 63.

Additionally, the judge also erred by not determining if Kimbrough waived his Fifth Amendment privilege by voluntarily testifying at the first trial, at a suppression hearing, and by signing numerous affidavits regarding his testimony. *See Commonwealth v. Penta*, 32 Mass. App. Ct. 36, 45-46 (1992) (error to allow witness who had voluntarily testified at prior hearing to assert Fifth Amendment). In addition, Kimbrough waived any Fifth Amendment right he had by signing the recantation affidavit. *See Commonwealth v. Cintron*, 43 Mass. App. Ct. 509, 516-518 (2001).

As Kimbrough had previously testified at the first trial, testified at a suppression hearing, and had signed an affidavit regarding his testimony, he should not have been allowed to assert the Fifth Amendment to avoid testifying at the second trial. The error constitutes a violation of

Hudson's due process rights under the Unites States Constitution. Hudson was severely prejudiced by the error in allowing Kimbrough to avoid testifying at the second trial.

Kimbrough did not have a valid Fifth Amendment privilege as he had testified at least twice and signed at least two affidavits regarding the subject matter of his potential testimony. The state court erred in finding that Kimbrough had validly asserted a Fifth Amendment privilege. The state court then rejected Hudson's claim of due process violation from the admission of Kimbrough's prior recorded testimony at the second trial on this erroneous finding. Hudson's due process rights were violated by the admission of Kimbrough's prior recorded testimony at his second trial and this court should grant the writ.

**Ground Two: Hudson was denied his right to effective assistance of counsel at trial where trial counsel failed to introduce a recantation affidavit signed by Kimbrough, the key Commonwealth witness.**

The Sixth Amendment to the United States Constitution guarantees Hudson's right to competent counsel. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984) (whether counsel's performance was below professional norms and whether the defendant suffered prejudice as result); *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). The failure to offer an available substantial defense constituted ineffective assistance of counsel. *United States v. Hill*, 827 F.Supp. 738, 741-742 (S.D. 1992). Hudson was denied his right to effective assistance of counsel where trial counsel failed to impeach Kimbrough, the key Commonwealth witness, with an affidavit in which he recanted his prior testimony which was read to the jurors and by not timely notifying the Commonwealth about a possible alibi defense.

The witnesses against Hudson were untrustworthy, each having substantial criminal records, histories of selling or using drugs, and motives to fabricate to help themselves (2nd Tr. 4/108, 115, 124, 130-144; 2nd Tr. 5/67-75; 107, 109, 173-174, 113, 150-166; 2nd Tr. 6/21-22, 48-

49, 100-113, 163-164, 169; 2nd Tr. 7/40-43, 52-63, 65-74). The four witnesses allegedly identifying Hudson were inconsistent regarding the perpetrators height and clothing. They changed their positions – even their ability to identify Hudson at all – from hearing to hearing. Their testimony went from tentative to certain depending on their motives.

The main prosecution witness, Kimbrough, who provided virtually the only evidence against Hudson, recanted the testimony he had given at Hudson's first trial and refused to testify at his second trial (2nd Tr. 4/40-46). Kimbrough's prior recorded testimony from the first trial was read to the jury at the second trial. Trial counsel failed to impeach Kimbrough prior recorded testimony with the recantation affidavit. Trial counsel's failure to impeach Kimbrough's veracity regarding being present at the scene and identifying Hudson as the killer with Kimbrough's affidavit amounted to ineffective assistance of counsel. There was no strategic justification for failing to impeach Kimbrough with the recantation affidavit.

Trial counsel testified at the hearing on the first motion for new trial that he did not remember whether he thought he could not introduce the recantation affidavit or whether his failure to introduce it was a tactical decision. However, trial counsel emphatically stated that, "I do know looking at this affidavit now that I can't conceive of having him on the witness stand and not going after him with this affidavit no matter what the Commonwealth was going to come back and say." (SA:II:U 15; see also SA:III:GG 437-438, 455, 459-460).

If trial counsel did not introduce the affidavit because he believed he was not allowed to do so under the rules of evidence, he was wrong. It was sufficiently clear that, at the time of Hudson's second trial in January of 1997, that trial counsel could have introduced the impeachment affidavit (SA:II:U 15-16) (discussion of the law of evidence regarding impeachment prior to January 1997).

If trial counsel made a tactical decision to not use the recantation affidavit, such a decision would have been manifestly unreasonable. As the Appeals Court wrote:

> We do not think that the inference regarding the defendant's trial attorney's concern about possible evidence of duress can fairly be drawn from the record. It is clear from the attorney's own testimony that he had determined that the significance of the affidavit to the defense was far greater than the risk of any potential adverse evidence of duress. He stated that he could not "conceive of having [Kimbrough] on the witness stand and not going after him with this affidavit no matter what the Commonwealth was going to come back and say." Indeed, had he made a tactical decision not to impeach Kimbrough with his affidavit, it would have been a manifestly unreasonable strategy in light of the circumstances facing him at the second trail. The evidence of Kimbrough's recantation was a powerful form of impeachment that should have been before the jury.

*Hudson*, 63 Mass. App. Ct. at 1113 (SA:II:U:15). The SJC disagreed and found that it was reasonable to assume that defense counsel was concerned about rebuttal evidence. *Hudson*, 446 Mass. at 716 (SA:III:II 6). This finding amounts to an unreasonable determination of the facts as at no point did defense counsel testify that he was worried about possible rebuttal evidence by the Commonwealth. On the contrary, counsel's only direct statement on the possible impact of rebuttal evidence was that if the witness was on the stand, counsel could not conceive of not using the recantation affidavit regardless of whatever rebuttal the Commonwealth might have.

In addition to neglecting to impeach Kimbrough with the recantation affidavit, trial counsel also failed to timely notify the Commonwealth about a potential alibi witness. The failure to timely notify the Commonwealth resulted in the ultimate sanction: Hudson was precluded from presenting an alibi defense at trial. The SJC recognized that this amounted to conduct measurably below what it expected of an ordinary fallible lawyer. *Hudson*, 446 Mass. at 725 (SA:III:II 10). The SJC, however, went on to find that Hudson was not prejudiced by being precluded from presenting an alibi defense. This decision is contrary to *Strickland* and also

amounts to an unreasonable interpretation of the facts.

Hudson was convicted on the basis of identification testimony. Two of the four witnesses to identify Hudson – Brown and Moody – did so for the first time at the second trial. A third witness – Jones – had previously recanted a prior identification and, moreover, merely testified that the photograph of Hudson looked like one of the assailants. The fourth witness – Kimbrough – had recanted his testimony. Although the case against Hudson was not strong, the surprise identifications by Brown and Moody and a surprise decision by Kimbrough to not testify meant that the complexion of the second trial was different from the first trial. On these circumstances, it became critical for Hudson to avail himself of his alibi defense.

This is not a case where a defendant is attempting to raise an alibi defense for the first time *via* a motion for new trial raising the question of whether the defendant actually wanted to use the alibi at trial. In this case, defense counsel was aware of this possible defense prior to trial and had actually tried to call a witness to put on the alibi defense at trial (SA:III:GG 400-402).

The Sixth Amendment to the United States Constitution guaranteed Hudson the right to effective assistance of counsel. *Strickland*, 466 U.S. at 687. In evaluating Hudson's claim, this Court must determine whether counsel's performance fell below an objective standard of reasonableness and resulted in prejudice to Hudson. *Id*. In other words, Hudson must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694.

Herein, Hudson has met his burden. Trial counsel's failure to introduce the recantation affidavit was objectively unreasonable as there was no possible benefit to Hudson in not fully challenging the key witness's credibility. *See United States v. Ortiz Oliveras*, 717 F.2d 1, 4 (1st Cir. 1983) (counsel's decision is unreasonable where it bears no relationship to a possible

defense strategy); *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (defense counsel has a constitutional duty to cross-examine the government's witnesses). Likewise, it was incompetence of counsel to not timely notify the Commonwealth about a possible alibi defense. Hudson was directly and severely prejudiced by trial counsel's deficient performance.

In determining whether Hudson was prejudiced, this court looks to any possible impact on the jury's decision in deciding whether there was prejudice. *See e.g., United States v. Jackson*, 918 F.2d 236, 243 (1st Cir. 1990), and *United States v. Paradis*, 802 F.2d 553, 564 (1st Cir. 1986). Each of the issues that trial counsel neglected was important because this case rested on the strength of the identification of Hudson, primarily by Kimbrough. The state court decision on this issue cannot be supported because the determinations that the failure to introduce the recantation evidence was a sound tactical decision and that Hudson was not prejudiced by the failure to present an alibi defense did not amount to incompetence of counsel, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 404. Moreover, the implication that Hudson was not prejudiced by trial counsel's failure is an "unreasonable determination of the facts." *Id.*

**Ground Three: The trial court denied Hudson's due process right to present witnesses by excluding evidence that an individual who looked like the defendant was committing robberies in the same general area at a similar time in a similar manner.**

Hudson's right to present witnesses in his own defense is a fundamental element of due process. *Washington v. Texas*, 388 U.S. 14, 19 (1967). State and federal rule-makers have some latitude under the Constitution to establish rules excluding evidence from criminal trials. *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Crane v. Kentucky*, 476 U.S. 683 (1986);

*Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6 (1983); *Chambers v. Mississippi*, 410 U.S. 284, 302-303 (1973); *Spencer v. Texas*, 385 U.S. 554, 564 (1967). This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690 *quoting California v. Trombetta*, 467 U.S. 479, 485 (1984). This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308, *quoting Rock v. Arkansas*, 483 U.S. 44, 58, 56 (1987). In *Chambers v. Mississippi*, *Crane v. Kentucky*, *Rock v. Arkansas*, and *Washington v. Texas*, all cited *supra*, the Supreme Court overruled state court decisions where state evidentiary laws violated a defendant's right to present a full defense.

To be admissible under Massachusetts law, misidentification evidence must only meet the relevancy standard. *See Commonwealth v. Jewett*, 392 Mass. 558, 562-563 (1984). Thus a defendant has aright to present evidence that another person recently committed a similar crime because such evidence tends to show that someone other than the defendant committed the charged crime. *Id.* A defendant need not demonstrate the same degree of similarity between the events as the Commonwealth would if it sought to introduce the acts for proving identity. *Commonwealth v. Brusgulis*, 406 Mass. 501, 506 n.7 (1990). However, the state court decision in this case required Hudson to meet a higher standard before he could introduce evidence that someone else may have committed the crime. The state court required Hudson to meet the standard that the evidence "cast doubt upon the identification of [Hudson] as the person who committed" the crimes. *Hudson*. 49 Mass. App. Ct. at 1118 (SA:I:E:2). This decision is

contrary to clearly established Federal law and is based on an unreasonable determination of the facts.

In the case at bar, the judge at the first trial held a *voir dire* hearing after the Commonwealth rested. The testimony offered at the *voir dire* hearing showed striking similarities between the identification procedures used and the two incidents themselves. The transcript of this *voir dire* was made available to the second trial judge when Hudson presented his motion *in limine* concerning the possible admission of "Jewett" evidence at the second trial.

The initial identifications by Ellis in the other robbery and Jones in this robbery were from photographs. Victims of both incidents expressed similar reactions to the photographs of Hudson. Both testified that they selected the photograph as someone who looked like the assailant, but were not positive. Both testified that when they saw Hudson after the incident fact to face, they realized that Hudson was the person depicted in the photograph, but was not the assailant.[4] *Compare Jewett*, 392 Mass. at 562-563.

Both incidents were close in time, just three and a half months apart, and location, in the same neighborhood only three quarters of a mile apart. *See Jewett*, 392 Mass. at 562-563 (time: within a week and location: within a neighboring town). Both involved robberies of an individual on the street by three black men, one of whom was shorter and one of whom was taller. A five-inch difference between the taller and shorter assailants was reported in both robberies. Both robberies involved the chasing down of the victim after an initial confrontation, and both incidents were marked by a unique and common feature: the lead assailant demanded

[4] At the second trial, Jones reinvented his testimony. He claimed he only said he realized Hudson was not the assailant because of fear (2nd Tr. 6/143-145). The absence of the "Jewett" defense evidence permitted the prosecution to present this version of history without challenge.

the victim's property by stating "kick it in."[5] Finally, it was beyond question, since Hudson was in custody at the time of the Ellis robbery, that he was completely innocent of that robbery. *Contrast Commonwealth v. Brown*, 27 Mass. App. Ct. 72, 76 (1989) (possibility that look alike committed both crimes but defendant failed to prove he did not commit the uncharged crime that he alleged was similar).

In this case, where misidentification was the only defense raised, the demands of due process required the admission of this relevant evidence as to misidentification. In its decision, the state court makes no reference to the fact that Hudson was identified, arrested, and charged with the other robbery. Of course, since Hudson was in custody at the time of the other robbery he did not commit it. Surely the fact that an individual who looked enough like Hudson that Hudson was mistakenly identified as this other person was committing robberies in the same neighborhood and in a similar method as the Twitty incident was information Hudson needed to be able to present to the jurors in order to present a complete defense. The state court decision affirming the exclusion of this evidence "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 404. Moreover, the implication that the two incidents were not similar is an "unreasonable determination of the facts." *Id.*

**Ground Four: The trial court violated Hudson's Sixth Amendment right to present a defense by excluding an alibi witness from testifying.**

Counsel for Hudson did not give the prosecution formal notice of an alibi prior to trial. Hudson did submit the name of his alibi witness to the trial court in the list of potential witnesses

[5] There was no basis in the record for the trial judge to find that the phrase "kick it in" was common and pedestrian (2nd Tr. 4/16).

to be read to the prospective jurors during jury empanelment. During the trial, either on January 22 or January 23, Hudson informed the prosecutor that he had an alibi witness, his girlfriend, and gave the prosecutor her address and date of birth, and a synopsis of her prospective testimony, which was that she was home with the defendant at the time in question (2nd Tr. 8/128). The witness was physically at the court house and Hudson offered to make her available for an interview with the prosecutor and to not call her until the following Monday (2nd Tr. 8/129).

It was defense counsel's position that he could make up his mind at the last minute because it seemed to him problematical whether or not to rely on an alibi (2nd Tr.8/129-130). Defense counsel also mistakenly believed that he had not signed a pretrial conference report and therefore did not believe he had to give prior notice (SA:I:C 29 n.18). The trial court barred Hudson from calling the witness, but saved his rights (2nd Tr. 8:130-131). The state court found no error in the exclusion of this evidence. *Hudson*, 49 Mass. App. Ct. at 1118 (SA:I:E: 1-2).

There were developments in this case during that second trial that clearly impacted the decision on whether or not to rely on an alibi defense. Kimbrough had signed an affidavit recanting his testimony given at the first trial. Prior to trial, defense counsel could calculate that Kimbrough's helpfulness to the Commonwealth would be seriously undermined. However, Kimbrough took the Fifth Amendment and his prior testimony was read to the jury. Jones had testified at the first trial in an equivocal manner about Hudson and had signed an affidavit indicating that he we first saw Hudson in person after the photographic identification procedure, he realized that Hudson was not the assailant. However, during the second trial, Jones claimed that Hudson was the assailant and that he had been equivocal out of fear. Brown was never asked to identify Hudson at the first trial. However, at the second trial, Brown volunteered an in-court identification.

The right to present a defense is a constitutional right guaranteed by the Sixth and Fourteenth Amendments. *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). However, the right to call witnesses is not absolute; in the face of "legitimate demands of the adversarial system," this right may be tempered according to the discretion of the trial judge. *Commonwealth v. Edgerly*, 372 Mass. 337, 343 (1977), *quoting United States v. Nobles*, 422 U.S. 225, 241 (1975). For example, a trial judge has the discretion to control the scope of the examination of witnesses, *Nobles*, 422 U.S. at 241, and can exclude witnesses whose testimony is cumulative, repetitive, or confusing, *Hamling v. United States*, 418 U.S. 87, 127 (1974).

Of course, a judge's discretion to impose sanctions for violation of a pretrial agreement is limited by the defendant's constitutional right to present evidence in his behalf. That right also is not absolute, however. "[I]f supported by the 'legitimate demands of the adversarial system,' the sanction of preclusion of testimony offered on behalf of a defendant may not violate Sixth Amendment rights." *Nobles*, 422 U.S. at 241. The task is to balance the Commonwealth's interest in enforcing its procedural rules against the defendant's constitutional right to present evidence in his behalf.

One reason for notice rules is the prevention of surprise. "In addition to preventing surprise, other factors [which must be] considered before a witness preclusion sanction is employed to enforce discovery rules are: the effectiveness of less severe sanctions, the materiality of the testimony to the outcome of the case, prejudice to the other party caused by the testimony, and the evidence of bad faith in the violation of the discovery rules." *United States ex rel. Enoch v. Hartigan*, 768 F.2d 161, 163 (7th Cir. 1985). Application of these factors to the facts of this case, demanded that Hudson be allowed to call his proffered alibi witness.

While the Commonwealth may have been "surprised" by the alibi witness, it has made no

suggestion as to how earlier notice would have helped its case. The Commonwealth has no right to make a witness give an interview prior to trial. And yet, herein, Hudson offered to make the witness available for an interview prior to calling her as a witness and to refrain from calling her for some days after notice was given. Her proffered testimony was straightforward, and did not lend itself to impeachment or significant investigation. Hudson disclosed that she was his girlfriend. The party truly surprised in this case was Hudson due to the significant change in circumstances concerning three of the four key Commonwealth witnesses.

There was no bad faith on the part of Hudson. Defense counsel did not even recall signing a pretrial conference report, and the prosecutor did not even mention that such a report existed. More important, the decision whether to put on an "I was home with my girlfriend" alibi defense is clearly problematical. The decision that it was needed was dictated by the Commonwealth's surprises for Hudson at the second trial. Hudson is entitled to the guiding hand of counsel. *See Brooks v. Tennessee*, 406 U.S. 605, 612-613 (1972). The essence of that right is the freedom to make critical strategic decisions in response to a changed landscape. Here, counsel did not open with an alibi claim and the landscape changed during the trial. Counsel did not intend to rely on an alibi defense until the last minute. When it came time to present Hudson's defense, defense counsel concluded that he should present an alibi defense (SA:III:GG 400).

The proffered alibi was material to the defense. The evidence was not cumulative or collateral. Finally, less severe sanction were available. The Supreme Court has recommended that alternative sanctions to preclusion are appropriate in most cases. *Michigan v. Lucas*, 500 U.S. 145, 152 (1991). In addition, in imposing the severest sanction, preclusion, the trial court should have made it clear that all factors were considered. Here, the trial court mentioned only

one factor: prejudice to the Commonwealth (2nd Tr. 8/130). Yet, there was no explanation of how or why the Commonwealth was actually prejudiced in this case. The preclusion sanction violated Hudson's federal due process rights.

The Appeals Court did not reach Hudson's Federal claim and thus review is *de novo*. *Lavallee*, 374 F.3d at 44 (claims not adjudicated on the merits in the state court proceedings are reviewed de novo); *see also, Williams*, 529 U.S. at 400 (opinion of O'Connor, J.) (pure questions of law and mixed questions of law and fact were reviewed de novo). The exclusion of the proffered alibi defense violated Hudson's constitutional rights for at least two reasons. First, the state court did not discuss how the prosecution was prejudiced by the late disclosure. Possible prejudice to the Commonwealth seems elusive where, although late, notice was given several days before the evidence would have been presented. Second, there was no discussion by the state court as to why lesser sanctions would not have been sufficient to cure the unstated prejudice to the prosecution. Especially given all the surprises that Hudson had to deal with – from surprise first time in-court identifications, to substantial changes in testimony, to the key witness asserting a Fifth Amendment privilege – surely there was a lesser sanction than preclusion.

The state court decision also results in the untenable position that exclusion of the alibi evidence was appropriate because of prejudice to the prosecution, and yet, Hudson was not prejudiced by the exclusion of this evidence because it was weak. If the evidence was weak, then that prosecution could not have been prejudiced by allowing it to come in and if the evidence was not weak, then Hudson was prejudiced by its exclusion. In either event, Hudson's right to present a defense was violated and this court should grant the writ.

**Ground Five: The trial court's decision while empaneling the jury to change the number of jurors to be seated unfairly prejudiced Hudson's use of his peremptory challenges in violation of his due process rights.**

In rejecting Hudson's claim of a violation of his Federal due process rights due to the last minute change in the number of jurors to be seated impaired his right to peremptory challenges the Appeals Court wrote, "no irregularity in the jury empaneling process shall be sufficient to set aside a verdict unless the objecting party has been injured or has objected before the verdict, requires some proof of prejudice even if counsel has made a timely objection." *Hudson*, 49 Mass. App. Ct. at 1118 (internal citations omitted) (SA:I:E:1). The Appeals Court continued that Hudson had not shown that any seated juror should not have been seated and there was not error. *Id.* However, the law regarding diminution of peremptory challenges is that a diminution of the right to peremptory challenges is reversible error without regard to prejudice. Thus, the judgment of the state court affirming Hudson's conviction is "contrary to" Supreme Court precedent as the state court made a statement of law inconsistent with a statement made by the Supreme Court and because the state court decided a case with "materially indistinguishable facts" differently from the Supreme Court. *Williams*, 529 U.S. at 413.

Although "there is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges," *Stilson v. United States*, 250 U.S. 583, 586 (1919), nonetheless the challenge is "one of the most important of the rights secured to the accused." *Pointer v. United States*, 151 U.S. 396, 408 (1893). The denial or impairment of the right is reversible error without a showing of prejudice. *Lewis v. United States*, 146 U.S. 370 (1892); *Harrison v. United States*, 163 U.S. 140 (1896); *cf. Gulf, Colorado & Santa Fe R. Co. v. Shane*, 157 U.S. 348. "For it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." *Lewis*, 146 U.S. at 378.

When empanelment began, Hudson was informed that he had 16 peremptory challenges (2nd Tr. 1/70-71). Near the end of the third day of jury selection, the trial court made an ambiguous comment that he was going to interview one more potential juror and then quit (2nd Tr. 3/154). The fifteenth seated juror had been selected a little earlier in the day, and Hudson still had five remaining peremptory challenges.

After being interviewed by the trial court, juror 8-9 was challenged by the co-defendant, and excused for cause (2nd Tr. 3/154-157). The prosecutor then asked the trial judge whether he was going forward with a jury panel of 15, and the judge said he was (2nd Tr. 3/157). Hudson objected to this change, informing the trial court that he had held back his five remaining peremptory challenges expecting to use them on selecting a good sixteenth juror (2nd Tr. 3/160). The trial court noted Hudson's objection and proceeded to trial with the 15 empaneled juror (2nd Tr. 3/160).

It has long been settled that a defendant's right to peremptory challenges is a "necessary part of trial by jury." *Swain v. Alabama*, 380 U.S. 202, 219 (1965). The right is not constitutional, but any system that denies or impairs a defendant's right to exercise peremptory challenges creates reversible error. *Id.* Hudson's Fourteenth Amendment right to due process was denied when he did not receive the benefits of what state law provides concerning peremptory challenges. *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988).

In the case at bar, the timing of the trial court's decision to change the number of jurors to be seated impaired Hudson's use of his peremptory challenges, denying him the benefits of Massachusetts's law on peremptory challenges and diminishing the challenges available to him. A defendant must be given adequate notice of the system to be used. *United States v. Turner*, 558 F.2d 535, 538 (9th Cir. 1977). When adequate notice is not given, even inadvertently, the

effect on the use of peremptory challenges can be dramatic. *United States v. Ricks*, 776 F.2d 455, 460-461 (4th Cir. 1985). A deviation from the announced system can also dramatically impact the use of challenges. *Knox v. Collins*, 928 F.2d 675, 661-662 (5th Cir. 1991).

Herein, Hudson objected to the late-announced change and indicated that he would have used his challenges differently. It is clear that the trial court's *sua sponte* reaction to the pace of jury selection rendered five of Hudson's peremptory challenges worthless. This was a significant diminution in the number of peremptory challenges called for by state law. Thus, Hudson's federal due process rights were violated and this court should grant the writ.

**Ground Six: The trial court violated Hudson's right to due process when it refused to instruct on the possibility that the witnesses had made a good faith, but mistaken, identification of Hudson.**

The central issue contested by Hudson at trial was his identification as one of the assailants. There was no evidence of Hudson's participation other than the identification testimony elicited from Kimbrough, Moody, Jones, and Brown.

Under Massachusetts law, "[f]airness to a defendant compels the trial judge to give an instruction on the possibility of an honest by mistaken identification when the facts permit it and when the defendant requests it." *Commonwealth v. Pressley*, 390 Mass. 617, 620 (1983). In the case at bar, Hughes drafted a request for an instruction on good faith mistaken identification (SA:I:C App. 52). At the conclusion of the charge omitting any instruction on that topic, Hudson joined the co-defendant's request and argued for giving an good faith mistaken identification instruction (2nd Tr. 9/143). The trial judge took the time to read *Pressley* and informed the defendant's that in his view, the case at bar fell into the explicit exception where the parties are so well known to each other or so closely related, that under sufficient lighting and with appropriate physical proximity, the identification is either a true or a lie (2nd Tr. 9/144-

145). This decision was based on an "unreasonable determination of the facts." *Williams*, 529 U.S. at 404.

Hudson suggests that the trial court misconstrued the import of the evidence at trial. In considering whether to grant an instruction requested by a defendant, the evidence must be viewed in the light most favorable to the defendant. *Commonwealth v. Figueroa*, 56 Mass. App. Ct. 641, 651 (2002). Here, only one of the four identifying witnesses, Kimbrough, claimed that he had seen Hudson before hanging around Orchard Park, and he admitted at the first trial that he did not know what person's last name. Compare this case with *Commonwealth v. Stoddard*, 38 Mass. App. Ct. 45, 48 (995), where the instruction was not required as the witness knew the defendant, *inter alia*, as a regular business customer. Herein, given the various descriptions, recantations, drug use, and numerous other factors affecting the reliability of these witnesses, the facts clearly permitted a mistaken identification defense. The error here certainly could have influenced the jury. *Commonwealth v. Rosado*, 43 Mass. App. Ct. 381, 383 (1997).

The faulty instructions, in this case omitting a required instruction on the possibility of a good faith, but mistaken identification, "so infected the entire trial that the resulting conviction violates due process." *See Cupp v. Naughten*, 414 U.S. 141, 147 (1973) (considering whether an instruction on witness truthfulness amounted to a violation of due process); *Zinermon v. Burch*, 494 U.S. 113, 135-136 (1990) (recognizing that a violation of state law can by a violation of due process under the Fourteenth Amendment).

The state court decision did not reach the Federal claim and thus review is *de novo*. *Lavallee*, 374 F.3d at 44; *Williams*, 529 U.S. at 400. The Appeals Court picked select questionable facts to support its decision that the instruction was not required. *Hudson*, 49 Mass. App. Ct. at 1118 (SA:I:E:3). However, Massachusetts law prohibits the court from cherry

picking select facts that perhaps go against a defendant's request and requires the court to view the evidence in the light most favorable to the defendant. *Figueroa*, 56 Mass. App. Ct. at 651. Viewing the evidence in the light most favorable to Hudson, only one of the identifying witnesses testified that he knew Hudson, one of the identifying witnesses had previously failed to identify Hudson, one of the witnesses first identified Hudson in-court, nearly seven years after the shooting and the final witness had gone back and forth with identifying and recanting his identification. In those circumstances, the failure to give the requested instruction violated state law and gave rise to a violation of Federal due process. This court should grant the writ.

**Ground Seven: The trial court violated Hudson's right to confront the witnesses against him by improperly limiting his cross-examination of Dorma Hughes concerning a conversation she overheard between a prosecutor and Dwayne Moody.**

Moody had explained that his failure to identify Hudson at an earlier hearing by claiming that Hudson's eyeglasses had blocked a distinctive scar (2nd Tr. 5/205). Moody denied that his identification of Hudson after that hearing was prompted by a prosecutor telling him that he missed the other assailant sitting at counsel table (2nd Tr. 5/206). During the defense case presented by Hughes, Dorma Hughes testified. On cross-examination, Hudson attempted to elicit from her evidence of a conversation she had overheard between a prosecutor and Moody following his failure to identify Hudson at the earlier hearing (2nd Tr. 8/84). On the Commonwealth's objection, a side bar was held during which Hudson explained the nature of the evidence he was seeking to introduce (2nd Tr. 8/84-86). Hudson believed that the witness would testify that she overheard the prosecutor at a previous hearing telling Moody that the third man at the defense table was the third person he was supposed to identify. The trial court denied Hudson this topic of cross-examination, apparently adopting the prosecutor's claim that it was

totem pole hearsay.

As the Commonwealth conceded on direct appeal, this evidence was not hearsay (SA:I:D 49; SA:I:E 2). The fact of such a conversation was what Hudson sought to prove. This fact put the lie to Moody's claim that he recognized some distinctive scar on Hudson once he saw Hudson without glasses. Because the conversation was not offered to prove the truth of the matter it asserted, but rather only for the fact that it was made, it was not hearsay. *Commonwealth v. Sullivan*, 410 Mass 521, 526 (1991). Whether viewed as an improper restriction of cross-examination under *Davis v. Alaska*, 415 U.S. 308 (1974), or an improper restriction of Hudson's right to present evidence under *Washington v. Texas*, 388 U.S. 14 (1967), this error violated Hudson federal due process rights.

The state court decision affirming the exclusion of this evidence "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 404. The defense at trail focused on impeaching the identifications of Hudson. Given the weaknesses exposed by defense counsel, it impossible to say that this additional attack on the identification on the identification made by Moody would not have been the straw the broke the camel's back, so to speak. In those circumstances, it is unreasonable to find that the admittedly erroneous exclusion of this evidence was harmless beyond a reasonable doubt. *See Hart v. Gomez*, 174 F.3d 1067, 1073 (9th Cir. 1999) (finding defendant prejudiced by counsel's failure to corroborate evidence favorable to the defendant with additional, available evidence).

**Ground Eight: The trial court denied Hudson his right to due process when it refused to declare a mistrial after a surprise, first-time, in-court identification of Hudson by Larry Brown.**

Counsel for Hudson raised his fear with the trial judge that the Commonwealth might attempt to elicit identification testimony from the witnesses Ramos and Brown, neither of whom had attempted to identify Hudson at the first trial (2nd Tr. 3/160-161). The Commonwealth informed counsel for Hudson that it would not seek such an identification from either witness (2nd Tr. 6/8-9). The trial judge precluded Hughes from asking Ramos to look around the courtroom to see if he could identify anybody on the grounds that such an in court identification procedure would be unfair (2nd Tr. 6/11-12).

The following day, during direct examination of Brown, the Commonwealth asked who he "saw get out of the car," to which Brown responded, "[t]he two gentlemen over there." (2nd Tr. 7/7). Hudson objected and moved for a mistrial (2nd Tr. 7/7-9). The Commonwealth said that he expected Brown to only identify Hughes. The trial judge said he found no trickery on the part of the prosecution and that there was no therapeutic remedy available. Hudson's motion for a mistrial was denied.

It is the prosecution's obligation to properly prepare their witnesses for trial. If the prosecution has been ordered by the court or has entered into an agreement with the defense to not put certain evidence in from of the jury, it is the prosecution's obligation to make sure that his witnesses are aware of the restrictions.

Overly suggestive identifications are suppressed not to deter prosecutorial misconduct, but rather to avoid an unfair trial. *United States v. Bouthot*, 878 F.2d 1506, 1516 (1st Cir. 1989) (requiring scrutiny of all suggestive identification procedures to determine whether taint requires exclusion to avoid due process violation); *Kirby v. Illinois*, 406 U.S. 682, 690-691 (1972)

(scrutiny of pretrial identifications is always necessary as due process forbids overly suggestive identifications which may cause irreparable harm). In this situation, the due process clause requires that any identification evidence be reliable. The surprise identification evidence in this case, regardless of the good faith or bad faith of the prosecution, deprived Hudson of his right to due process.

The circumstances of Brown's identification was highly suggestive. *Miller v. Illinois* 434 U.S. 220, 229-230 (1970) (victim had viewed the defendant at arraignment, heard prosecutor recite evidence implicating the defendant, and was told she would view a suspect). Brown had witnessed Hudson sitting at the defense table during several pretrial proceedings and at the first trial prior to identifying him at the second trial. In addition, Hudson was seated with his co-defendants who were known to Brown. This was not a neutral encounter and given the risk of misidentification, the identifications should not have been presented to the jury. *Neil v. Bigger*, 409 U.S. 188, 198 (1972) (it is the likelihood of a misidentification that violates the defendant's due process rights). The trial judge candidly admitted that there was no curative remedy in his view. In such circumstances, it was constitutional error to deny the motion for mistrial.

The Appeals Court and the SJC have already recognized that there were serious problems with the identification of Hudson in this case (SA:V:XX 37, 44); *Hudson*, 446 Mass. at 721. Where the judge admitted an identification that resulted from a highly suggestive confrontation (Brown), where the jury was not told that a witness had recanted his identification (Kimbrough), and where the judge excluded impeachment evidence as to another tainted identification (Moody discussed in Ground Seven above), Hudson did not receive a fair trial. The state court's decision was that a first time identification seven years after the crime and after the witness had viewed Hudson seated at defense counsel numerous times during the first trial and other hearings was

not unnecessarily suggestive. *Hudson*, 49 Mass. App. Ct. at 1118 (SA:I:E 2-3). The state court's faulty logic "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 404. Hudson was denied his rights to due process and a fair trial under the United States Constitution.

**Ground Nine:The prosecutor failed to turn over exculpatory evidence to Hudson.**

The failure to turn over exculpatory evidence to Hudson that undermines the Commonwealth's theory and that impeached an eyewitness identification was constitutional error. *Brady v. Maryland*, 373 U.S. 87, 94 (1963). According to *Brady*:

> [T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecutor.

*Id.* at 87.

In this case, the Commonwealth failed to turn over a letter of one Derek Tyler, a potential witness, informing the prosecutor that Kimbrough is his cousin and that Kimbrough sent a letter to Tyler admitting that he testified falsely at Hudson's first trial (SA:II:N103-104, 106). Before trial, Hudson requested all exculpatory information and the Commonwealth signed an agreement to turn over such information. Defense counsel, however, was not notified about the existence of Tyler. The Commonwealth's actions violated the Massachusetts Rules of Criminal Procedure. The failure to disclose this witness went to the heart of Kimbrough's identification against Hudson and even Kimbrough's alleged presence at the crime. If the jurors had heard this information from Tyler, they may likely have discredited Kimbrough's prior recorded testimony, which was extremely damaging to Hudson. *Brady*, 373 U.S. at 94. Hudson established the requisites of *Brady* and was therefore entitled to a new trial for violation of his due process rights

under the Fourteenth Amendment.

The state court decision denying this claim (SA:III:II 11) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Moreover, the implication that Hudson was not prejudiced by the failure to turn over the letters is an "unreasonable determination of the facts." Id. In essence, the SJC found that because the prosecutor could not find Tyler's letter in its file, it was not sent. However, the court did not address Tyler's affidavit in which he avers that he, in fact, sent copies of a letter from Kimbrough to the prosecutor (SA:II:N 106). The law cannot be that a state can avoid a claim of failure to disclose evidence by later destroying that evidence. It was unreasonable for the state to determine that the letters had not been sent without regard to an affidavit from the person who claimed to have sent the letters.

**Ground Ten: The Commonwealth failure to disclose exculpatory evidence in its possession that could have materially aided Hudson amounts to a Brady violation and violated Hudson's due process rights under the United States Constitution.**

Due process of law requires that the Government disclose to a criminal defendant favorable evidence in its possession that could materially aid defense against the pending charges. *Brady*, 373 U.S. at 87. "The Public faith in the integrity of our criminal justice system could not be sustained otherwise." *Commonwealth v. Daniels*, 445 Mass. 392, 402 (2005). "Favorable evidence need not be dispositive evidence. Evidence may be favorable or exculpatory, and thus required to be disclosed. Although it is not absolutely destructive of the Commonwealth's case or highly demonstrative of the defendant's innocence." *Commonwealth v. Ellison*, 376 Mass. 1, 22 (1978).

**A. The Commonwealth failed to disclose three categories of exculpatory evidence: Toya Kimbrough materials, police reports relating to Andrade, and other police reports and notes relating to the early stages of the investigation.**

Before both the first and second trials, Hudson requested all police reports, written recorded statements, all prospective witnesses statements, inducements, rewards and promises, and exculpatory evidence (SA:V:XX 137-168) (before first trial) (SA:V:XX 173-179) (before second trial). The prosecutor failed to provide all exculpatory evidence including that which was specifically requested when declining to disclose two police reports made concerning Andrade (SA:V:XX 170-171), other written recorded statements and notes (SA:V:XX 201-206), and the Toya Kimbrough – the sister of Kimbrough – materials suggesting a secret deal made with Kimbrough (SA:V:XX 198-200). Not only did the Commonwealth fail to turn over all the requested discovery, but the prosecutor informed that Court that she had, in fact, already turned over all witness statements (SA:V:XX 162). The failure to disclose this evidence, whether intentional or accidental, resulted in a violation of the defendant's due process rights under the United States Constitution and caused extreme prejudice. *United States v. Bagley*, 473 U.S. 667 (1985); *Kyles v. Whitley*, 115 S.Ct. 1555 (1995).

**B. The Toya Kimbrough materials suggest that the prosecution had made a deal with Kimbrough.**

From the record it appears that the prosecution made an agreement with Kimbrough back in December 1989 to hire or assist a relative to gain employment at a unspecified job. Upon examining the prosecutor's files pursuant to this Court's order, Hudson discovered Toya Kimbrough's résumé, Toya Kimbrough's "personnel data form" and a handwritten note on Marge Cardoza's stationary indicating Toya Kimbrough had been interviewed and apparently hired in December 1989 at an unspecified job (SA:V:XX 198-200, 207). The documents suggest

that Toya Kimbrough had received employment based on the Commonwealth's or its agent's recommendation in exchange for Kimbrough's cooperation (SA:V:XX 195).

At the first trial, Kimbrough testified that he knew how the game was played and hoped for consideration after being asked about a deal. Kimbrough denied any deal existed in exchange for testimony. At the second trial, Kimbrough was allowed to plead the Fifth and his prior recorded testimony was read to the jury (2nd Tr. 5/67-75; 173-174). His testimony indicating hope to receive consideration implied that the prosecution was not committed to rewarding Kimbrough in any way for his testimony. The prosecutor did not disclose the existence of what arguably was a secret deal with Kimbrough nor correct what now appears to be the perjured testimony. Moreover, by not revealing the Kimbrough materials to Hudson prior to trial, the Commonwealth deprived Hudson of his right to impeach Kimbrough with a strong suggestion that he was lying and had actually been offered promises, rewards, and inducements. In addition the jury never received an instruction on how to weigh Kimbrough's testimony with special consideration if they found that he in fact had received compensation in exchange for his testimony.

Any promises by the prosecution made to a witness to induce him to testify must be disclosed to the defense as a promise, reward or inducements, even if it is as vague as consideration. Hudson was entitled as a matter of right to cross examination of a witness to whom consideration has been promised, both to show bias on the part of the witness and to establish whether the witness expects favorable treatment in return for his testimony. *Davis v. Alaska*, 415 U.S. 307, 315-321 (1974). Although the witness's hopes and expectations regarding consideration are relevant to this inquiry, the prosecution's commitments to the witness must be made known. *Banks v. Dretke*, 540 U.S. 668 (2004); *Giglio v. United States*, 405 U.S. 150

(1972); *Napue v. Illinois*, 360 U.S. 264 (1959). Hudson need not prove the existence of a deal. It is enough that Hudson was denied an opportunity to present evidence suggesting a deal to the jury. However, the record in this case does strongly suggest that there was a deal between the Commonwealth and Kimbrough. The prosecutor knew or should have known that Kimbrough's denial of the deal was materially false. This is inconsistent with the rudimentary demands of justice. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).

The non-disclosure of the Toya Kimbrough documents substantially and negatively impacted the defense. Had trial counsel had the documents in question at the second trial he would had presented Kimbrough's recantation affidavit along with the evidence of a deal and argued that Kimbrough had testified falsely at the first trial because of the deal he received from the Commonwealth (SA:V:XX 196).

More important, the documents demonstrate that the prosecution's representation that it did not know about Kimbrough until April 6, 1990, was materially false. In explaining why Kimbrough was disclosed so close to the first trial, McCarthy testified that he only revealed Kimbrough to the prosecutor on April 6, 1990, upon her inquiry about whether anyone else viewed photographs and identified the defendant (2nd Tr. 4/87, 116-167). This testimony is undermined by the Kimbrough documents found in the prosecutor's file strongly suggesting that the District Attorney's Office was considering Toya Kimbrough for employment in 1989.

The documents found in the files rebut McCarthy's explanation and materially bolsters the defense at trial that Kimbrough's testimony was a product of contrivance on the part of the prosecution or its agents (1st Tr. 6/107-108, 187; 2nd Tr. 7/199-200). If Hudson had the undisclosed material he would have been able to raise additional defenses at trial and otherwise bolster his defense. Most important, trial counsel indicated in his affidavit that had he had the

Toya Kimbrough information prior to the second trial, he would have introduced the Kimbrough recantation at trial (SA:V:XX 196). The Kimbrough recantation was important enough that the Appeals Court previously reversed the convictions due to counsel's failure to introduce Kimbrough's recantation at trial (SA:V:XX 41-52).[6]

The non-disclosure of the material in question violated Hudson's confrontation rights and right to investigate and present a defense. His confrontation and due process rights were violated under the 6th and 14th amendments to the U.S. Constitution: thereby warranting granting the writ.

**C. The undisclosed police reports and notes discovered upon review of the Boston Police Department file relating to the Twitty killing could have been used by the defendant at trial to challenge the Commonwealth's version of how Hudson came to be implicated in the killing.**

Disclosure of Andrade's statements, written police reports and notes and the Toya Kimbrough materials would had provided a stronger case for defense by calling into question the true source of the allegations against the defendant and the motivation of his accusers; thereby resulting in a markedly weaker prosecution case. Additionally, Hudson states that the undisclosed police reports and notes call the Commonwealth's time-line – in which Hudson became a suspect on April 24, 1989, when the photo array was assembled and displayed – into question.

The newly discovered notes indicate that Hudson may not have become a suspect until sometime later than April 24, and that Andrade instead of Kimbrough began the entire

[6] Although the SJC reversed that decision, the SJC did not rule that failure to introduce the Kimbrough affidavit did not prejudice the defendant, rather, the SJC ruled that trial counsel made a strategic decision to not introduce the recantation. *Hudson*, 446 Mass. at 718-719 (SA:III:II 6-7). Trial counsel has indicated that if he had this new information he would have used the recantation affidavit at the second trial (SA:V:XX 196).

investigation against Hudson, possibly to avoid suspicion of his own involvement. Had the Andrade reports been timely disclosed, Hudson would have been able to establish that Andrade did not obtain his information about the Twitty homicide from Hudson (SA:V:XX 191).

McCarthy arrested Hudson on unrelated charges on April 23, 1989, after he had been shot along with Andrade in Academy Homes Complex. Hudson was placed under police guard until he was booked on April 24, 1989. Andrade was not immediately arrested nor placed under police guard even though they were wanted for identical criminal offenses (SA:V:XX 192).

On April 24, 1989, Detective McCarthy pulled Hudson's photo as a suspect in the Twitty incident after a source had identified him as the shorter assailant. According to McCarthy his source was Kimbrough. McCarthy claimed that he did not disclose Kimbrough until the prosecutor inquired about other witnesses that viewed photos in the case on April 6, 1990. However documents found in the Commonwealth's files rebut that fact and indicate that as early as December 1989 the Commonwealth knew of Kimbrough and possibly been engaged in a deal for his testimony. *See* Argument Ground Ten A above for full discussion. McCarthy did not produce Kimbrough's purportedly original statement that he recorded on April 24, 1989 but issued the Commonwealth a copy of that statement (2nd Tr. 7/197). The date cited on the statement cites April 29, 1989, and it appears that someone had attempted to change the nine into a four (2nd Tr. 7/199-201).

On May 6, 1989, McCarthy and his partner booked Andrade at Area B-2 station on armed assault in a dwelling and attempted murder. According to Andrade's booking sheet and card, he was not placed in a cell nor are the charges reflected on his booking card indicating an arrest (SA:V:XX 192). At some point Andrade spoke to homicide detectives and made an inculpatory statement against Hudson. There is no indication that Andrade was held at this time.

Court records indicate that on May 8, 1989, Andrade appeared in Roxbury Court and was released on a $100 personal recognizance: even though he had open warrants for armed robbery and unlawful possession of a firearm (SA:V:XX 210-211, 215). On May 22, 1989, Andrade again appeared in Roxbury Court and his bail was increased to $25,000. At this time he was held at the Charles Street Jail. He subsequently made statements leading to the September 1, 1989 police report (SA:V:XX 171).

According to undisclosed written police reports and notes dated April 22 and 23, 1989, Detectives initially received information that Carter and Chuck Goforth were the shooters in the Twitty killing (SA:V:XX 201-202). The April 28, 1989 notation from a fellow detective to Fogerty to call Twitty's mother lists both men as the investigator's primary suspects: notably at that time Hudson's name does not appear (SA:V:XX 203). It appears that both men remained the primary targets until May 3, 1989, when Detectives began investigating a third suspect named Michael Barton as a participant (SA:V:XX 204). The May 6, 1989, police report authored by Fogerty indicated that at the time of Andrade's actual interview that Andrade had been shot a few days ago and his arm was in a sling (SA:V:XX 170). The common usage of a few is two to three, certainly no more than five. According to Fogerty, his customary practice during an interview for 33 years was to handwrite out the statements and within the next day or so type it up (2nd Tr. 8/177). Fogerty's report is dated two weeks after Andrade sustained his injuries. The few days reference place the interview between the 25th to the 28th at the latest as the date that Boston homicide became aware of Andrade's statement. However, McCarthy may have learned of Andrade's statement much earlier than the dates on the reports. It is clear that McCarthy maintained contact with Andrade during his hospital stay in order to know when Andrade would be discharged.

The undisclosed April 28, 1989 and May 11, 1989 notes demonstrate that Fogerty maintained contact with the Twitty family presumably to keep them updated on the investigation (SA:V:XX 203, 206). There was no notation in the police file that Fogerty had informed the family that a suspect had been identified in their son's death until May 11, 1989 (SA:V:XX 206). Remarkably, the April 28, 1989 note includes reference to two suspects in the Twitty murder, but makes no mention of Hudson (SA:V:XX 203). If Hudson had been identified as a suspect on April 24 as the Commonwealth claims, surely his name would be included on the list of suspects in the April 28 note. The May 11, 1989 note indicates that an officer told Twitty's mother that they knew who killed her son and the person responsible was being held on another homicide and the witness refused to testify (SA:V:XX 206). The September 1, 1989 note indicates that Andrade had refused to testify as long as he was in jail (SA:V:XX 171).

Presumably the May 11, 1989 note is a reference to the police having spoken with Andrade. The language used in this note suggests that this person initially identified and then convinced the detectives that Hudson was the shorter assailant. According to Boston homicide, they were not aware of Kimbrough until May 7, 1990. Thus the reference in the May 11, 1989 note could not be pertaining to Kimbrough (Suppression hearing 07/08/90 at pages 58 to 59). According to Green, the Parole Department informed her that Andrade refused to testify against Hudson at the Grand Jury (SA:V:XX 169). This supports a theory that Andrade was detained on May 22, 1989, because of his refusal to testify.

Combining this information with the remaining undisclosed material would have permitted Hudson to argue that McCarthy and homicide detectives were not forthcoming about the circumstances in which Hudson became a suspect nor when the array was assembled and displayed. Hudson could have argued persuasively that prior to the assembling of the

photographic array or Jones's viewing the array, McCarthy had in fact disclosed Andrade's identification and knowledge of unpublished facts to homicide detectives.

The May 6, 1989 report is reflective of an earlier interview and that was subsequently recorded on May 6. McCarthy's disclosure appears to have developed homicide's interest to interview Andrade and convinced detectives that Hudson was the shorter assailant. Had this information been presented to Hudson he could have argued that the detectives, armed with information from Andrade, set out to induce what have become several questionable identifications of Hudson (SA:V:XX 173, 196-197). Several witnesses prior and after trial have recanted their identifications as being products of coercion (SA:V:XX 45, 184, 186, 189-190). Furthermore, apparently as a result of Andrade's cooperation or an effort to secure his cooperation, he was not booked in the traditional sense and by inference released from Area B-2 police station on May 6. When he subsequently appeared in Roxbury Court he was released on a $100 personal recognizance (SA:V:XX 210-211). The record suggests that someone attempted to persuade Andrade to appear before the Grand Jury unsuccessfully (SA:V:XX 169). This, perhaps, led to Andrade's increased bail at his next Roxbury Court appearance on May 22, 1989. Hudson could have argued that this supports his theory that the Commonwealth or its agents began to suspect Andrade as the shorter assailant or had serious reservations about how he obtained the information.

Andrade is a better fit to the initial description and knew specific facts about the incident that only the assailant would have known (SA:V:XX 192, 214).[7] This accompanied by

[7] In its opposition below, the Commonwealth claimed that Hudson's assertion that Andrade was a better match to the shorter assertion relies on a single document misses the point. First, the description of Andrade making him a better match for the shorter assailant appears in at least two documents submitted with the third motion for new trial. Second, whether Andrade was in fact a better match to the shorter assailant should have been a matter for the jury to

Andrade's later admission to possessing access to the murder weapon may have increased that concern, considering Andrade did not mention this access in his initial statement (SA:V:XX 171). At the very least, the Commonwealth may have feared that disclosure of these facts would had armed Hudson with a theory that Andrade was the actual perpetrator and or allowed him to attack the reliability of the identification against Hudson. Perhaps this motivated the Commonwealth to fail to disclose the reports. Of course, Hudson is not required to show that the Commonwealth intended to violate his rights: he must simply show that he was prejudiced by their failure to disclose the materials in their possession.

Given the above, the undisclosed reports and documents weaken the Commonwealth's identification of Hudson and suggest that Kimbrough's various statements were coached. All of this bolsters Kimbrough's recantation affidavit in which he states that he was not present. *Lindsey v. King*, 769 F.2d. 1034, 1042 (1985) (where identification is an important issue the defendant has a right to show that the identification evidence of him was unreliable). The failure to disclose exculpatory police reports and notes violated Hudson's due process rights under the United States Constitution.

**D. Hudson's investigation of Andrade revealed further evidence supporting his claim that the Commonwealth's admitted failure to disclose the Andrade reports prejudiced the defendant.**

Hudson incorporates by reference the argument he made in his *pro se* memorandum of law in support of his third motion for new trial (SA:V:XX 104 to 123). In short, the undisclosed Andrade materials would have called into question the Commonwealth's version of how Hudson came to be a suspect in this case. Given the weaknesses of each of the identifications, this

---

decide. By failing to disclose this information, the Commonwealth precluded Hudson from raising this defense at trial. That is the very definition of prejudice.

additional impeachment could have been sufficient to change the jurors' minds and could have resulted in verdicts of not guilty. Additionally, the Andrade materials could have also supported a third party culprit defense, namely that Andrade was actually the shorter assailant.

Moreover, had Hudson had timely disclosure of the Andrade reports he could have investigated Andrade and discovered additional exculpatory evidence. For instance, Hudson could have discovered that Andrade received a $100 personal recognizance even though he faced a possible life sentence on home invasion and armed robbery (SA:V:XX 210-211). Prior to the second trial, Hudson could have also uncovered that Andrade's eventual plea deal in which he plead guilty to various charges including armed robbery and firearm violations and then walked home from the courtroom with no more time to serve strongly suggests he had received consideration from the Commonwealth (SA:V:XX 216-229). Andrade was also allowed to have the home invasion charge placed on file without a change of plea, thus avoiding a mandatory minimum sentence of twenty years (SA:V:XX 216-217). The Commonwealth precluded Hudson from discovering all this by failing to meets its obligations under *Brady*.

**E. This Court should grant the writ.**

The Commonwealth's failure to disclose the Toya Kimbrough materials, the reports relating to Andrade, and the other police reports and notes regarding the early stages of the investigation of the Twitty killing prejudiced Hudson. As Hudson had requested this exculpatory information prior to trial, the failure to disclose it, whether intentional or accidental violated Hudson's due process rights under the United States Constitution. The state court decision (SA:V:ZZ 2-3) that Hudson was not prejudiced by the failure to disclose the requested information "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 404. Moreover, granting the writ is appropriate where the state court decision was based on an "unreasonable determination of the facts." *Id.*

The Appeals Court purports to make a determination of facts relative to Hudson's claims without the benefit of an evidentiary hearing on Hudson's third motion for new trial. Multiple courts have ruled that making factual findings without the benefit of an evidentiary hearing results in an unreasonable determination of the facts. *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (if a state court makes evidentiary findings without holding a hearing and giving the petitioner an opportunity to present evidence, such findings clearly result in an unreasonable determination of the facts); *Bryan v. Mullin*, 335 F.3d 1207, 1215-16 (10th Cir. 2003) (declining to apply presumption where state court failed to hold an evidentiary hearing). As the state court decision is based on an unreasonable determination of the facts, it is entitled to do deference and this court's review is *de novo*.

The state court decision is also contrary to and an unreasonable application of clearly established Federal law. The state has a duty to disclose exculpatory evidence. As discussed above, there were three broad categories of exculpatory evidence that the prosecution did not turn over to Hudson. The state court must do more than simply identify the Federal claim for its decision to be entitled to deference. *Lafler v. Cooper*, 566 U.S. ___, 132 S.Ct. 1376, 1390 (2012).

Additionally, as to the Andrade materials, the state court applied the wrong legal standard when considering whether Hudson was prejudiced by the failure to disclose them. Hudson suggests that those materials would have given rise to a third party defense - that Andrade was involved and not Hudson. In reviewing the denial of a third party claim, the state must not condition the admissibility of the defendant's evidence on the strength of the prosecution's case.

*Holmes v. South Carolina*, 547 U.S. 319, 329 (2006). However, the Appeals Court appears to have based its decision at least in part on the strength of the prosecution's case. *Hudson*, 87 Mass. App. Ct. at 1118 (SA:V:ZZ 2-3).

## VI. Conclusion.

In this case, there were numerous errors that went to the heart of this case. Grounds one, two, three, four, six, seven, eight, nine, and ten, while based on different Federal rights, all relate to the central question of whether Hudson was the shorter shooter or not. Some inculpatory evidence was improperly admitted while exculpatory evidence was improperly excluded. Additional exculpatory evidence was improperly withheld from Hudson. Trial counsel was ineffective for not introducing the recantation evidence at trial and for not timely giving notice of an alibi. Cross-examination was improperly limited and the court failed to give a required instruction on identification. Moreover, ground five raises a structural error regarding the selection of the jury. For the foregoing reasons, this court should grant the writ.

MAC HUDSON
By his attorney,

/s/ Alan D. Campbell

Alan D. Campbell
B.B.O. No. 634188
65 Railroad Avenue
Hamilton, MA 01982
(857) 321-1673

Dated: April 24, 2016

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 24, 2016.

/s/ Alan D. Campbell
Alan D. Campbell